AUG 27 2013

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

2013 AUG 28  PM 12 10

STEPHAN HARRIS, CLERK
CHEYENNE

Kim D. Cannon (#5-1401)
DAVIS & CANNON, LLP
40 South Main Street
P.O. Box 728
Sheridan, WY 82801
Tel: 307-672-7491
Fax: 307-672-8955
*cannon@davisandcannon.com*

J. Mark Stewart (#6-4121)
DAVIS & CANNON, LLP
422 West 26th Street
P.O. Box 43
Cheyenne, WY 82003
Tel: 307-634-3210
Fax: 307-778-7118
*mark@davisandcannonchey.com*

ATTORNEYS FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

BANK OF JACKSON HOLE, NANCY          )
BUTCHER, and KURT HALL, TRUSTEES     )
OF THE DEAN W. HALL MINERAL TRUST    )
DATED SEPTEMBER 25, 1981; BANK OF    )
JACKSON HOLE, NANCY BUTCHER, and     )
KURT HALL TRUSTEES OF THE DEAN       )
W. HALL IRREVOCABLE TRUST DATED      )
JULY 1, 1982; BANK OF JACKSON HOLE,  )
TRUSTEE OF THE JOY LUCILLE HALL      )
AND DEAN W. HALL TRUST DATED         )
JULY 10, 1973; and HALL-ATLAS, LLC,  )
                                     )
        Petitioners/ Plaintiffs,     )
                                     )
v.                                   )        Case No. *13 CV 186-S*
                                     )
SALLY JEWELL, Secretary of the Interior; )
UNITED STATES DEPARTMENT OF          )
THE INTERIOR, INTERIOR BOARD OF      )
LAND APPEALS; and BUREAU OF LAND     )
MANAGEMENT,                          )
                                     )
        Respondents/Defendants.      )

## COMPLAINT AND PETITION FOR REVIEW OF AGENCY ACTION
## AND FOR DECLARATORY RELIEF

Come now the Plaintiffs and for their Complaint and Petition for Review of Agency Action allege as follows:

### PETITION FOR REVIEW

Pursuant to 28 U.S.C.A. §1331, 5 U.S.C.A, § 702, and 30 U.S.C.A. §1276, the Bank of Jackson Hole, Nancy Butcher and Kurt Hall, Trustees of the Dean W. Hall Mineral Trust dated September 25, 1981, Bank of Jackson Hole, Nancy Butcher and Kurt Hall, Trustees of the Dean W. Hall Irrevocable Trust Dated July 1, 1982, Bank of Jackson Hole, Trustee of the Joy Lucille Hall and Dean W. Hall Trust dated July 10, 1973, and Hall-Atlas, LLC, hereby petition the court for review of Order IBLA 2012-45 affirming the decision of the Bureau of Land Management, Wyoming State Office, regarding the Hall Ranch-Wildcat Creek Alluvial Valley Floor Fee Coal Exchange Application Dated May 27, 2010, WYW-179096 ("Order") entered July 29, 2013 by the United States Department of the Interior, Office of Hearing and Appeals, Interior Board of Land Appeals. Attached hereto and incorporated herein by reference as Exhibit A is a copy of the referenced Order.

### THE PARTIES

1.    Plaintiffs Bank of Jackson Hole, Nancy Butcher, and Kurt Hall are the Trustees of the Dean W. Hall Mineral Trust dated September 25, 1981; Plaintiffs Bank of Jackson Hole, Nancy Butcher, and Kurt Hall are the Trustees of the Dean W. Hall Irrevocable Trust dated July 1, 1982; and Plaintiff Bank of Jackson Hole is the Trustee of the Joy Lucille

Hall and Dean W. Hall Trust dated July 10, 1973 ("Hall Family Trusts").  The Hall Family Trusts own lands located along Wildcat Creek in Campbell County, Wyoming that are the subject of the  Hall Ranch – Wildcat Creek Alluvial Valley Floor Fee Coal Exchange Application pursuant to the Surface Mining Control and Reclamation Act ("SMCRA"), P.L. 95-87 (codified at 30 U.S.C.A. § 1201 et seq.) and WYO. STAT. §§ 35-11-401 through 35-11-437.  The Hall Family Trusts own all the fee coal on the 11,865 acre Hall Ranch.  Plaintiff Hall-Atlas, LLC is the lessee and agent of the Hall Family Trusts authorized to seek an exchange of the coal owned by the Hall Family Trusts.  The Hall Family Trusts are members of Hall-Atlas, LLC.

2.     Sally Jewell ("the Secretary") is the Secretary of the Interior, an agency of the United States Government, and is charged with, among other things, approving exchanges of fee coal for federal coal pursuant to the Section 510(b)(5) of SMCRA [30 U.S.C.A § 1260(b)(5)].  The Secretary is sued in her official capacity.

3.     The Bureau of Land Management ("BLM") is an agency within the Department of Interior to which fee coal exchange applications are made and which, through the State Director, Wyoming State Office, BLM on October 20, 2011 described and accepted for exchange for federal coal 940 acres of the Trusts' fee coal lands pursuant to 30 C.F.R. § 3436.

4.     The Interior Board of Land Appeals ("IBLA") is an administrative adjudicatory body within the Department of the Interior.  The IBLA is designated by the Secretary of the Interior to govern hearings resulting from disputes under SMCRA.  *See* 43 C.F.R. § 4.1(3) (2013).  This is an appeal from the IBLA's July 29, 2013 Order affirming the

BLM's decision to limit the coal exchange to 940 acres rather than the applied for 1,643.4 acres.

## QUESTIONS PRESENTED

5.    This is an action to determine several questions:

> (a) whether the BLM, contrary to law, ignored the exclusive responsibility of the Wyoming Department of Environmental Quality ("WDEQ") to make the determination as to lands to be excluded from mining and eligible for exchange under SMCRA and further ignored the determination that WDEQ made;

> (b) whether the IBLA improperly failed to consider and evaluate the record before the BLM and the supplemental documents provided by the applicant including the Statements of Lyle Randen of September 19, 2011 and November 11, 2011; and

> (c) whether IBLA's decision is unsupported by substantial evidence, arbitrary and capricious and not in accordance with the law.

## JURISDICTION AND VENUE

6.    Jurisdiction is based on 28 U.S.C. § 1331 because this action arises under the laws of the United States, including SMCRA, 30 U.S.C.A §§ 1201 et seq.; 30 U.S.C.A. § 1276(a)(2); the Administrative Procedures Act, 5 U.S.C.A §§ 551-706; and the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201-2202.  The agency action under appeal constitutes final agency action under 43 C.F.R. § 4.403 and 5 U.S.C.A § 704.

7.    Venue is proper in this Court pursuant to 28 U.S.C.A. § 1391 and 30 U.S.C.A. § 1276(a)(2) because the events giving rise to this action occurred in this judicial district and the lands subject to the action are situated therein.

4

## PROCEDURAL BACKGROUND

8.  On May 27, 2010, the Hall Family Trusts submitted their Application: Hall Ranch-Wildcat Creek Alluvial Valley Floor Fee Coal Exchange ("Application") to the BLM pursuant to 43 C.F.R. § 3426.   The purpose of the Application was to effect an exchange of their coal underlying the alluvial valley floor for federal coal elsewhere in the State of Wyoming.   The Application was submitted to the BLM by Norwest Corporation on behalf of the Hall Family Trusts.

9.  The decision determining the eligibility for the coal exchange was made by the Wyoming Department of Environmental Quality (WDEQ) set forth in a letter of March 25, 1985 by Lyle Randen, Administrator of the Land Quality Division of the WDEQ.

10. This letter was a response to The Carter Mining Company's submission of the Camp Dresser Report to the WDEQ with a map and a legal description entitled "Part I, Specific Wildcat Property Areas for Which Alluvial Valley Floor Declarations are Requested." The legal description incorporated in "Part I" contains the 1,643.4 acres for which the Exchange Application was filed.

11. During the consideration of the Exchange Application and as a result of specific requests by the BLM, no fewer than three letters were written to the BLM by the WDEQ, the agency with the conclusive responsibility to make the determination as to the acreage for which a mining permit would be denied.

12. On October 20, 2011, Wyoming State BLM Director Donald A. Simpson by letter to Larry Messinger, Norwest Corporation, identified and accepted for exchange only 940

acres of the 1,643.4 acres identified and delineated by WDEQ in its March 25, 1985 decision.

13. On November 17, 2011, the Hall Family Trusts submitted to the IBLA their Notice of Appeal, appealing the BLM's exchange decision. After briefing, the IBLA issued its ORDER affirming the BLM's decision on July 29, 2013 which is attached hereto as Exhibit A. The Hall Family Trusts seek judicial review by this Court of that ORDER.

## FACTS

### *History of the Hall Ranch Agricultural Operations and Coal Lease*

14. The Hall Ranch consists of an 11,865 acre ranch in Campbell County, Wyoming, portions of which lie along Wildcat Creek and which were first homesteaded in 1901 by O.W. Hall and his son, Ernest Hall.

15. Ernest Hall is the grandfather of Rhoda Hall Tate who, with her husband Dave Tate, currently operate the Hall Family ranch.

16. Given the timing of their homestead entries and those of their neighbors, whose lands they bought over the decades that followed, the Halls acquired substantial fee coal. The first Hall homesteads, and those of their neighbors, Schwartz and Butcher, were all on the most fertile lands along the creek bottom – the alluvial valley floors.

17. Over time the original Halls acquired the lands of others who homesteaded around them throughout the 1930's. Ernest's son, Dean W. Hall, took over the ranch operation in 1945 and added a small amount of acreage. When Dean retired from the ranch operations in 1974, his stepson, Randy Buckley, took over the agricultural operations. In 1990,

6

Dean's daughter, Rhoda Hall Tate, and her husband, Dave Tate, began operating the ranch.

18.  The 11,865 acre ranch now owned by the Hall Family Trusts has remained intact since Dean Hall retired in 1974, and the ranch continues to operate much as it did in the 1940's, with the Tates now as the full-time operators/managers living and working on the land.

19.  The Carter Mining Company (TCMC) leased the fee coal underlying the Hall Ranch. After the enactment of SMCRA, TCMC submitted a request for a pre-application determination along with technical documentation to determine the extent of the Wildcat Creek AVF.  This request was submitted on December 13, 1984.  The State of Wyoming's declaration of the AVF came in the form of Lyle Randen's letter dated March 25, 1985.

### Topography and Hydrology of the Alluvial Valley Floor

20.  The topography of the Wildcat Creek drainage, which drew the Halls to homestead over 110 years ago, is a fertile alluvial valley floor recharged by the adjacent alluvium.  The lands are critical for the historical agricultural operations which the Halls have maintained continuously throughout their ownership.

21.  The 1,643.4 acre parcel at issue straddles Wildcat Creek and its tributaries that run through the heart of the Hall Family ranch.  The Wildcat drainage on which the Hall Family ranch is located is marked by a series of draws including Mumma Draw, Lonetree Draw, and Homestead Draw, which drain into the Wildcat Creek bottom.

22.  In 1984, Camp, Dresser & McKee, Inc. conducted a comprehensive alluvial valley floor investigation of The Carter Mining Company's Wildcat Property which included, among other lands, all of the Hall Ranch fee owned coal lands.  The results of that investigation are contained in its Final Report of Alluvial Valley Floor Investigations – Wildcat Property dated June 18, 1984 (hereafter "Camp Dresser Report").  The portions of the Camp Dresser Report set forth in the "Application" are attached hereto as Exhibit B.

23.  The study area encompassed 2,340 acres along a 4.4 mile reach of Wildcat Creek, which included the Schwartz and Butcher Ranches' coal leases, as well as the 1,643.4 acres of Hall Family Trusts fee coal lands proposed for exchange.

24.  The Camp Dresser Report notes that "Associated valley bottom land forms include two discreet levels of terrace surfaces.  The valley margin areas are characterized by numerous alluvial fans, colluvial slopewash debris, and exposures of bedrock strata." (Camp Dresser Report, 1-1).

25.  The Report located and studied areas of flood irrigation, areas of enhanced agricultural production through subirrigation, areas of pasture land that are apparently subirrigated, potentially flood irrigable areas based on an analysis of soil, and topographic and surface water availability factors.

26.  After digging and evaluating 28 test pits and 125 shallow auger holes, the conclusion of the Camp Dresser Report was that "unconsolidated stream-laid deposits encompass 1,649 acres . . ."[1]  (Camp Dresser Report, 1-2).

---

[1]  Note that this reference to 1,649 acres is to the drainage as a whole, and not precisely to the 1,643.4 acres on which the Applicant holds fee coal rights and for which the exchange is sought.

***Law Prohibiting the Mining of Alluvial Valley Floors and Mandating Exchanges.***

27.    Historically productive agricultural operations like the Hall Family ranch were a special focus of the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201, *et seq.*, which was designed to protect the environment by precluding mining in or near alluvial valley floors and those adjacent lands housing the systems supplying water to the alluvial valley floors.

28.    By its terms, SMCRA was enacted to:

> assure that the coal supply essential to the Nation's energy requirements, and to its economic and social well-being is provided, and <u>strike a balance between protection of the environment and agricultural productivity</u> and the Nation's need for coal as an essential source of energy; . . . [and]

> [to] <u>assist the States in developing and implementing a program</u> to achieve the purposes of this Act.  (emphasis added)

Pub.L. No. 95-87, § 102, 92 Stat. 448 (1977) (as codified at 30 U.S.C. § 1202(f), (g) (1982)).

29.    As a means of achieving these objectives, SMCRA prohibits surface mining without a permit issued by a state's regulatory authority which, in the case of Wyoming, is the Director of Wyoming's DEQ.  *Whitney Benefits, Inc. v. United States*, 18 Claims Court 394, 397 (Claims Court 1989).

30.    Specifically, the AVF provision of SMCRA allowed the issuance of a mining permit by the state's regulatory authority only where it found that the surface coal mining operation west of the 100th Meridian would:

(A) not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands

as to which the regulatory authority finds that if the farming that will be interrupted, discontinued, or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production . . . [and] (B) not materially damage the quantity or quality of water in surface or underground water systems that supply these valley floors... 30 U.S.C. § 1260.

31.    In direct response to the enactment of SMCRA, Wyoming immediately took action to fulfill its responsibility to develop a surface mine permitting process that fully complied with SMCRA so that it could have "primacy" – exclusive jurisdiction over surface coal mine permitting.

32.    The State of Wyoming initially submitted its proposed program on August 15, 1979, and after extensive input and modifications, the Wyoming Program was officially adopted and implemented on November 26, 1980. 45 F.R. 78637-78641.

33.    The Federal Register discussion of the permanent program submission from the State of Wyoming under the Surface Mining Control and Reclamation Act of 1977, notes particularly the Secretary of the Interior's findings of Wyoming's capability to carry out the provisions of SMCRA and to meet its purposes.  45 F.R. 78641 and Finding 12.4:

> Wyoming's alternative approach to 30 CFR 785.19(c), (d), and (e) (identification of alluvial valley floors and evaluation of the effect that mining on alluvial valley floors has on farming) is in accordance with the provisions of SMCRA and is consistent with 30 CFR Chapter VII.

45 F.R. at 78641.

See also Department of Interior Findings 6.4 (Hydrology Guideline), 45 F.R. 78645, Finding 6.5 (Alluvial Valley Floor Guideline, No. 9, Exhibit G.1.h.), 45 F.R. 78645, which concludes with this specific finding:

> The Secretary finds the Alluvial Valley Floor Guideline consistent with 30 CFR 785.19 and that Wyoming has established methods for identifying, evaluating, and protecting alluvial valley floors.

45 F.R. 78645. See also Department Findings 12.4 (45 F.R. 78646); 14.75 – 14.78 (45 F.R. 78663).

34.    To specifically enforce the AVF provisions of SMCRA, Wyoming law recognizes two categories of land excluded from coal mining, and specifically provides that no surface coal mining permit be approved unless the Land Quality Division Administrator finds:

(v)    The proposed operation would:

(A)    Not interrupt, discontinue, or preclude farming on alluvial valley floors that are irrigated or naturally subirrigated, but, excluding undeveloped range lands which are not significant to farming on said alluvial valley floors and those lands as to which the administrator finds that if the farming that will be interrupted, discontinued or precluded is of such small acreage as to be of negligible impact on the farm's agricultural production; or

(B)    Not materially damage the quantity or quality of water in surface or underground water systems that supply these alluvial valley floors. Paragraph (n)(v) of this section shall not affect those surface coal mining operations which in the year preceding August 3, 1977, produced coal in commercial quantities, and were located within or adjacent to alluvial valley floors or had obtained specific permit approval by the administrator to conduct surface coal mining operations within said alluvial valley floors. If coal deposits are precluded from being mined by this paragraph, the administrator shall certify to the secretary of the interior that the coal owner or lessee may be eligible for participation in a coal exchange program pursuant to section 510(b)(5) of P.L. 95-87 [30 U.S.C. § 1260(b)(5)].  WYO. STAT. ANN. § 35-11-406(n)(v)(A) and (B).

The lands described in each of these two sections are referred to as the A Lands (Subpart A above, i.e., the lands "significant to farming") and the B Lands (Subpart B above, i.e. the lands "adjacent to alluvial floors" overlying surface or underground water systems supplying the alluvial valley floor).

11

35.    Coal rights underlying both kinds of lands are excluded from mining and are, therefore, eligible for an exchange subject to the state agency's determination.  The statutory basis of this distinction is found in WYO. STAT. ANN. § 35-11-406 (n)(v)(A) and (B), enacted to meet the requirements of SMCRA.[2]

36.    Under subpart (n)(v)(A) (hereafter "A Lands") the focus is on the agriculturally significant uses on the surface (hence "AVF significant to agriculture").  Under subpart (n)(v)(B) (hereafter "B Lands") the focus is on both the surface and subsurface of adjacent lands – the geohydrological characteristics that supply water to the AVF.

*Determination of Alluvial Valley Floors and Adjacent Supporting Lands.*

37.    Consistent with WYO. STAT. ANN. § 35-11-406 (n)(v)(A) and (B) , a distinction is drawn in the Camp Dresser Report between lands on which a coal mine would "interrupt, discontinue and preclude farming on alluvial valley floors" (see analysis of Sections 1 through 7 of Camp Dresser Report) and those lands where, as the State Director noted in his October 20, 2011 letter, a coal mine would "materially damage the quantity or quality of water in surface or underground systems that supply the AVFs."  (See analysis of Section 8 of Camp Dresser Report).

38.    Of 1,649 acres of land described in Paragraph 25 above, the Camp Dresser Report stated:

> Alluvial materials meeting AVF criteria included deposits associated with the principal Wildcat Creek drainage, alluvium deposited by Mumma

---

[2]    In many discussions of the SMCRA provisions and exclusions, "A Lands" and "B Lands" are collectively referred to as AVF lands, even though only "A Lands" are technically AVF.  As a threshold determination, the WDEQ must find some lands "significant to farming" (A Lands) before those lands and the adjacent lands (B Lands) whose subsurface supplies those A Lands can be eligible for exchange.

Draw, and alluvial fans along valley margin areas. Inclusion of alluvial fans is predicated on their interrelationship (i.e., overlying, interbedded, etc.) with valley bottom alluvial terrace landforms. Material types include coarse sands and gravels adjacent to the existing channel of Wildcat Creek, fine grained sands and silts of overbank splays, and silty/clayey deposits associated with the alluvial fans. (Camp Dresser Report, 1-2).

39.   In addition to the portions of the AVF significant to farming, the Camp Dresser Report found that mining the adjacent areas would impact the AVF. Specifically, the report concluded:

In addition to the probable significant AVF, mining may also be excluded from all adjacent alluviated areas. Data indicate the presence of a single, laterally extensive alluvial ground water system; adjacent alluvium may provide recharge to the subirrigated agricultural areas. **Disturbance of any of the alluvium would potentially dewater or reduce the extent of subirrigation, thereby interrupting/ discontinuing agricultural production**. (Camp Dresser Report, 1-3). (emphasis added).

40.   The Camp Dresser Report addresses these lands and reached the following conclusion:

The data and appurtenant conclusions described in previous sections indicate the presence of single alluvial aquifer. The majority of alluvial deposits exhibit some degree of saturation, suggesting an areal extent for the alluvial ground water of about 1,500 acres. The probable developed AVF area encompasses 766 of these acres, 433.5 of which appear to be significant to agriculture. Based on data provided by TCMC [The Carter Mining Company], total mine pit depths would potentially range from 100 feet on the northeast edge of the Wildcat Property to as deep as 400 feet in the southwest sectors. Given these depths, and the apparent prevailing hydrologic conditions, it is doubtful that any of the estimated 1,500 acres of saturated alluvium could be disturbed without appreciable impacts to the essential hydrologic function of the significant AVF. Impacts to the areas of subirrigated agriculture would potentially include:

1. Potentiometric alterations, whereby ground water levels in the alluvium are reduced by the creation of steep gradients from undisturbed areas towards the mine pit(s).

13

2. Reduction or interruption of recharge; subsurface geologic data and color IR photography indicate that ground water flow to the Wildcat property appears to come from both up-valley reaches (above the Butcher Ranch) as well as from tributaries entering Wildcat Creek within the TCMC lease area.

3. Modification of the prevailing ground water quality conditions, largely via the altered recharge and potentiometric conditions.

   As noted in Sections 8.1 and 8.2, data indicate that bedrock does not provide significant recharge to the valley bottom alluvium. If subcropping overburden does transmit ground water to the alluvium, however, disturbance of the hillsides adjacent to the valley bottom could also impact alluvial ground water. At a minimum, such impact could include the development of a ground water flow gradient from subirrigated areas in the valley, through the alluvium, toward mine pits along the valley margin. **In summary, the configuration of the TCMC lease area, straddling the Wildcat Valley, inhibits mining on any portion of the lease without disturbance of subirrigated agriculture in the valley center.** (Camp Dresser Report, Section 8.3, pp. 8-4 – 8-5). (emphasis added).

41. The Camp Dresser Report conclusion submitted to the WDEQ in December, 1984 found that while 433.5 acres were significant to agriculture (A Lands), the areal extent of the alluvial groundwater in the single alluvial aquifer encompassed 1,500 acres. (The difference between the 433.5 acres and the 1,500 acres were the B Lands).

42. Of most significance, however, was the final sentence that the "configuration of the TCMC lease area [the full 1,643.4 acres at issue] . . . inhibits mining any portion of the lease without disturbance of subirrigated agriculture in the valley center."

43. The Camp Dresser study area also encompassed lands in the adjacent Schwartz and Butcher Ranches, and while finding there were AVF "A Lands" on those ranches, the Camp Dresser Report concluded they were not "significant to agriculture." Those lands and leases thus did not qualify, and it was not even necessary to address whether there

14

were adjacent "supporting" "B Lands."  (Camp Dresser Report, Section 6.0, Significance

to Farming).

***State of Wyoming's Department of Environmental Quality Decision on the Extent of the Fee
Coal Property Excluded from Mining by SMCRA is Determinative and Binding.***

44.    One of the primary findings made by Congress in enacting SMCRA was the reason for

the delegation to the states of decision-making authority over surface coal mining:

> [B]ecause of the diversity in terrain, climate, biologic, chemical, and other
> physical conditions in areas subject to mining operations, the primary
> governmental responsibility for developing, authorizing, issuing, and
> enforcing regulations for surface mining and reclamation operations
> subject to this Act should rest with the States . . . 30 U.S.C. § 1201(f).

45.    The State of Wyoming sought and obtained primacy over the permitting process.  45 F.R.

78637 – 78684, November 26, 1980.  Accordingly, the decision as to whether and to

what extent an AVF and related lands were excluded from surface coal mining was a

decision to be made exclusively by the State of Wyoming.  *Hodel v. Virginia Surface

Coal Mining & Reclamation Ass'n., Inc.*, 452 U.S. 264, 289, 101 S.Ct. 2352, 69 L.Ed.2d

1 (1981); *Pennsylvania Federation of Sportmen's Clubs, Inc. v. Hess*, 297 F.3d 310, 315-

316 (3rd Cir. 2002); *Nat. Min. Ass'n v. U.S. Dep't of Interior*, 177 F.3d 1, 9-10 (D.C. Cir.

1999), *Coteau Properties Co. v. Department of Interior*, 53 F.3d 1466 (8th Cir. 1995).

46.    To determine whether and to what extent the Hall Ranch lands would be excluded from

mining under SMCRA, The Carter Mining Company, the holder of a coal lease on the

Hall ranch properties, submitted a pre-application to the Wyoming Department of

Environmental Quality on December 13, 1984, supported by the Camp Dresser Report

dated June 18, 1984.

47.   The Wyoming Department of Environmental Quality conducted its own investigation of the "pre-application" submitted in December, 1984, and the WDEQ decision was set forth in the letter of March 25, 1985 from Lyle Randen, Administrator of the Land Quality Division (LQD) of the WDEQ.

48.   The materials submitted by The Carter Mining Company from the Camp Dresser Report to the WDEQ included a document referenced as "Part I, Specific Wildcat Property Areas for Which Alluvial Valley Floor Declarations are Requested." The map attached to the decision letter of March 25, 1985 incorporates these lands as those which fall under the statutory exclusions of WYO. STAT. § 35-11-406(u)(v).

49.   The map shows the cross-hatched AVF lands which are "significant to farming" (A Lands) and the adjacent supporting areas within the boundary of the private coal lands (B Lands).

50.   The Wyoming BLM State Director Donald A. Simpson's letter of October 20, 2011 is premised on the WDEQ letter of March 25, 1985 and the authority of the WDEQ to make this decision:

>   Furthermore, the Secretary of the Interior shall accept a summary denial of a permit made by the regulatory authority made pursuant to 30 CFR 785.19(c) as **conclusive evidence** of the existence of an AVF (43 CFR 3436.2-1(b)). The regulatory authority, in this instance is the Wyoming Department of Environmental Quality (WDEQ). State Director Donald A. Simpson's letter of October 20, 2011, p. 1. (emphasis added).

51.   In reference to the letter of March 25, 1985, State Director Simpson noted that the delineated lands were determined to be significant to farming operations and that upon "submission of a permit application to mine coal under SMCRA of 1977, these areas would be excluded from mining." (State Director Donald A. Simpson's letter of October

20, 2011, quoting the WDEQ letter of Lyle Randen, Administrator of WDEQ, dated March 25, 1985).

52.     Notwithstanding the Secretary of Interior's recognition of the authority held by the WDEQ to make this decision as to the lands to be excluded from mining, and notwithstanding the significance of this decision as "conclusive evidence of the existence of an AVF" (43 CFR 3436.2-1(b)), the State Director's letter of October 20, 2011 did not include the 1,643.4 acres identified in the Camp Dresser Report as the "specific Wildcat property areas for which alluvial valley floor declarations are requested," and found by WDEQ to be excluded from mining.   Instead, the State Director unilaterally, incomprehensively and mistakenly identified only 940 acres, rather than 1,643.4 acres, as eligible for an exchange under the AVF provisions of SMCRA.

***Uncontroverted Evidence of WDEQ's Decision on the Extent of the Acreage Excluded from Mining Under SMCRA was Submitted to the State Director.***

53.     After filing the Application for Exchange dated May 27, 2010 the State Director, by letter dated July 29, 2010 (Exhibit C), requested that the WDEQ "supply clarification . . . as to exactly which lands in the AVF application would be 'significant' to farming and excluded from mining . . ."  Letter of State Director Donald A. Simpson dated July 29, 2010.

54.     The State Director's letter focused only on the lands "significant to farming," the A Lands, and reveals that the State Director did not grasp that the lands eligible for exchange included both the A Lands and the B Lands.

55.      Indeed, it was appropriate to obtain any necessary clarification from the WDEQ because this decision was in the exclusive province of the WDEQ to make.

17

56. To confirm the exact lands determined by the WDEQ within the Hall Family Ranch to be excluded from surface coal mining activities under SMCRA's AVF provisions, three important letters were written by the Wyoming Department of Environmental Quality to the Wyoming Bureau of Land Management following the submission of the application for exchange in May, 2010. These letters were provided in response to repeated questions from the BLM regarding the WDEQ's determination.

57. The first was from Mark Rogaczewski to Mike Karbs dated November 10, 2010. Mr. Rogaczewski, the Supervisor of the WDEQ Land Quality Division District III, addressed the specific question of what lands were determined by the WDEQ to be excluded from surface coal mining activities. (Exhibit D).

58. Mr. Rogaczewski noted that the Land Quality Division had completed a review of the materials originally submitted by The Carter Mining Company and determined that the lands excluded from surface coal mining activities "are those described in the legal land description provided in Part I, Specific Wildcat Property Areas for Which Alluvial Valley Floor Declarations are Requested."

59. A copy of this document, Part I containing the legal description, which was first submitted to the WDEQ in December, 1984 with the TCMC pre-application for a mining permit, is attached to Mr. Rogaczewski's November 10, 2010 letter. It encompasses all 1,643.4 acres.

60. Subsequently, again following another request from the BLM, a second letter dated April 20, 2011 was sent to Wyoming BLM State Director Donald A. Simpson by Alan Edwards, Acting Administrator of the Land Quality Division. (Exhibit E). Mr. Edwards

reconfirms that the decision of the state agency was to exclude mining in all those areas in Part I, Specific Wildcat Property Areas for Which Alluvial Valley Floor Declarations are Requested, which was submitted to the Land Quality Division on December 13, 1984.

61.     Finally, following a further inquiry and meeting with the BLM, a third letter of September 1, 2011 from Nancy Nuttbrock, Administrator, Land Quality Division, Wyoming Department of Environmental Quality (Exhibit F), reiterated yet again the agency's support of the earlier determinations and decisions of the LQD personnel and the 1985 decision, stating:

> On August 10, 2011, I met with Mr. Claypool and the BLM staff to discuss this issue. During this meeting, the BLM expressed their concern regarding the determinations made by the LQD. Between the conclusion of that meeting and the date of this letter, I have reviewed the file volumes, and engaged in numerous conversations with several LQD staff and members of DEQ management regarding this issue, and I see no reason to question the decisions made by the LQD. I am, therefore, advising you that the LQD reaffirms that the applicant is eligible for participation in a coal exchange program.

62.     The State Director's letter of October 20, 2011 expressly acknowledges that the WDEQ determination is conclusive.

63.     There is no question that WDEQ Administrator Lyle Randen's letter of March 25, 1985, and three letters from WDEQ in 2010 and 2011, determine the presence of an AVF and that the full acreage referenced in the Application is eligible for exchange. The exact acreage subject to that determination was further confirmed in two statements by Lyle Randen.

64.     The original statement dated September 19, 2011 (Exhibit G) and the supplemental statement of Lyle Randen (Exhibit H) dated November 11, 2011, immediately following

the decision of the State Director of October 20, 2011, describe the responsibility that Lyle Randen had as the Administrator of the Land Quality Division in 1983 through 1985, the applicable SMCRA and Wyoming Environmental Quality Act provisions, together with relevant regulations, under which pre-applications were submitted for his review, the nature and extent of the WDEQ's own review of hydrology, vegetation, soils, geology, geomorphology, hydrogeology, and other related matters by its technical staff, and the decision that culminated in his letter of March 25, 1985.

65.    In both the original statement dated September 19, 2011 and the supplemental statement of Lyle Randen dated November 11, 2011, he pinpoints the acreage included in the alluvial valley floor designation as being that described in Part I which is attached to the supplemental statement.  With the statement and supplemental statement of Lyle Randen, there can be no doubt that the WDEQ decision contained in the critical March 25, 1985 letter, as reconfirmed by the three WDEQ letters summarized above, constituted the State of Wyoming's decision that all 1,643.4 acres are precluded from mining and cannot be permitted, and are, therefore, eligible for exchange.

66.    Both the BLM and the IBLA acknowledge that the Secretary of Interior shall accept the Wyoming regulatory authority summary denial of a coal mining permit application as "conclusive evidence of the existence of an AVF."  Neither the BLM nor the IBLA can substitute its judgment of the existence of an AVF for that of the state authority.

67.    Neither the BLM nor the IBLA held any kind of hearing at which testimony could be offered to resolve any factual issue related to the nature and extent of the 1985 Wyoming Department of Environmental Quality decision.

68.     The BLM decision at issue in the IBLA opinion failed to reference or rely upon any of
        the WDEQ letters solicited by the BLM including Mark Rogaczewski's letter of
        November 10, 2010, Alan Edwards' letter of April 20, 2011, and Nancy Nuttbrock's
        letter of September 1, 2011. The IBLA, in affirming the BLM decision, references these
        letters but fails to acknowledge the plain meaning of the letters. Nor does it remand for
        an evidentiary determination of the acreage subject to the 1985 WDEQ decision letter.

69.     Neither the BLM nor the IBLA, affirming the decision of the BLM, makes any notice to
        the Statements in the record by the author of the March 25, 1985 WDEQ decision, Lyle
        Randen, which Statements are dated September 19, 2011 and November 11, 2011.
        Accordingly, the IBLA has made its decision affirming the decision of the BLM ignoring
        the uncontroverted statements of the author of the "conclusive" decision by the State of
        Wyoming through the WDEQ dated March 25, 1985.

## FIRST CLAIM FOR RELIEF

### (SMCRA and APA)

70.     Paragraphs 1 through 69 are realleged and incorporated herein by reference.

71.     Pursuant to 30 U.S.C.A. § 1260(b), surface mining coal operations are prohibited on
        lands which comprise alluvial valley floors that are significant to farming and on those
        adjacent lands which, if mined, would materially damage the quantity or quality of water
        in the surface or underground water systems that supply such valley floors.

72.     The determination as to which lands this prohibition applies is delegated, in Wyoming,
        solely to the Wyoming Department of Environmental Quality as the regulatory authority
        and any such determination is conclusive evidence of the existence of such lands.

73.   The BLM and the Secretary of the Interior, through the IBLA, ignored the exclusive responsibility of the Wyoming Department of Environmental Quality to make the determination as to lands to be excluded from mining and eligible for exchange under SMCRA and failed to consider and evaluate the record before the BLM and the supplemental documents provided by the applicant including the Statements of Lyle Randen of September 19, 2011 and November 11, 2011.

74.   Accordingly, the BLM and IBLA decision that only 940 acres of land, rather than the 1,643.4 acres which WDEQ determined were to be excluded from mining as described herein, is unsupported by substantial evidence, arbitrary and  capricious and not in accordance with the law as required by the Administrative Procedures Act 5. U.S.C.A § 706.

## SECOND CLAIM FOR RELIEF

## (DECLARATORY JUDGMENT)

75.   Paragraphs 1 through 74 are realleged and incorporated herein by reference.

76.   This is a claim for the following declaratory relief:

    (a)   That the exclusive decision-making authority to determine the acreage on which coal mining is prohibited and for which coal exchanges shall be made is that of the State of Wyoming under SMCRA; and that the decision of the WDEQ of March 25, 1985 is conclusive;

    (b)   That the decision of the WDEQ Land Quality Administrator Lyle Randen is the governing conclusive determination that controls the coal acreage to be exchanged by the BLM;

    (c)   That the uncontroverted facts on the record support the conclusion that the WDEQ found that the lands identified in the Camp Dresser Report and described therein, consisting of 1,643.4 acres, are the fee coal lands to be exchanged under Part A ("AVF significant to farming") and Part B (adjacent alluvium) of Wyo. Stat. § 35-11-406(n)(v)(A) and (B); and

22

(d)     That the Defendants are required by law to forthwith effect a coal exchange involving the 1,643.4 acres of the Plaintiffs' lands for which the Application seeks for exchange.

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

(a)     Reverse the IBLA decision and declare that based on the uncontroverted evidence before the agency, the 1,643.4 acres of land delineated on the map attached to the WDEQ letter of March 25, 1985, which include both lands within the AVF significant to farming (A Lands), and the hydrologically connected alluvium adjacent to such lands (B Lands) are qualified for exchange of federal coal;

(b)     For declaratory relief as follows:

    (1)     That the exclusive decision-making authority to determine the acreage on which coal mining is prohibited and for which coal exchanges shall be made is that of the State of Wyoming under SMCRA; and that the decision of the WDEQ of March 25, 1985 is conclusive;

    (2)     That the decision of the WDEQ Land Quality Administrator Lyle Randen is the governing conclusive determination that controls the coal acreage to be exchanged by the BLM;

    (3)     That the uncontroverted facts on the record support the conclusion that the WDEQ found that the lands identified in the Camp Dresser Report and described therein, consisting of 1,643.4 acres, are the fee coal lands to be exchanged under Part A ("AVF significant to farming") and Part B (adjacent alluvium) of WYO. STAT. § 35-11-406(n)(v)(A) and (B);

    (4)     That the Defendants are required by law to forthwith effect a coal exchange involving the 1,643.4 acres of the Plaintiffs' lands for which the Application seeks for exchange; and

(c)     Alternatively, if the Court finds there is any ambiguity in the 1985 WDEQ decision, as clarified by the three WDEQ letters and the two Lyle Randen Statements, that the matter be remanded for a factual hearing before the BLM

23

limited to the determination of whether the WDEQ decision applied to 1,643.4 acres (Part A and Part B), or to the Part A lands reflected on the cross-hatched portion of the map attached to the 1985 decision, and that the hearing be held within a prescribed time frame;

(d)     Such other equitable relief as the Court deems just and proper.

DATED this ___26th___ day of August, 2013.

_____
Kim D. Cannon (#5-1401)
J. Mark Stewart (#6-4121)

DAVIS & CANNON, LLP
40 South Main Street
P.O. Box 728
Sheridan, WY  82801
Tel: 307-672-7491
Fax: 307-672-8955
*cannon@davisandcannon.com*

DAVIS & CANNON, LLP
422 West 26th Street
P.O. Box 43
Cheyenne, WY  82003
Tel: 307-634-3210
Fax: 307-778-7118
*mark@davisandcannonchey.com*

ATTORNEYS FOR PLAINTIFFS